IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KIARA L. GIVHAN, | ) | Case No. 1:16CV00801 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.     Introduction

Plaintiff, Kiara L. Givhan ("Givhan"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for adult Child's Insurance Benefits ("CIB") or Supplemental Security Income ("SSI") under Title II of the Social Security Act.  This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

Because I conclude that the administrative law judge ("ALJ") did not commit legal error and substantial evidence supports his determinations, I recommend that the final decision of the Commissioner be AFFIRMED.

## II.     Procedural History

Plaintiff previously received SSI based on disability as a child because of an intellectual disability.  (Tr. 13)  Eligibility for her disability benefits was reviewed under the rules for determining disability in adults when plaintiff attained the age of 18.  (Tr. 13, 92-93)  Following

a hearing, Administrative Law Judge ("ALJ"), Kendra S. Kleber, issued a decision on January 21, 2011 affirming the administrative determination that plaintiff's disability had ended by February 1, 2008.  (Tr. 13)  Plaintiff appealed ALJ Kleber's decision, which was affirmed by an opinion and order issued by Judge Dan Aaron Polster on May 27, 2015 after his receipt of a report and recommendation from a magistrate judge.  *See Givhan v. Comm'r,* Case No. 1:13cv611, 2015 WL3408006 (N.D. Ohio, May 27, 2015).

On February 11, 2011, plaintiff filed two separate applications for CIB based on the earnings record of her mother, Diane Givhan, and her deceased father, Wade Thompson.  (Tr. 151-152, 468-485)  Plaintiff also filed an application for SSI on April 8, 2011. (Tr. 153, 459-467) These applications were denied at the initial and reconsideration levels.  (Tr. 151-53, 205-207, 312-14, 319-21, 326-28, 334-36, 341-43, 348-50)  Plaintiff filed a request for a hearing on the 2011 applications, but a hearing was not scheduled.  (Tr. 13, 335)

On June 11, 2013, plaintiff filed a second set of applications for CIB based on the earnings of her mother and father.  (Tr. 487-515)  She also filed another application for adult SSI. (Id.)  Plaintiff alleged in these applications that she had been disabled since January 22, 2011, the day after ALJ Kleber's decision.  (Tr. 488, 496, 502)  These 2013 applications were denied initially and upon reconsideration.  (Tr. 263-265, 305-307, 360-362, 367-369, 374-76, 384-85, 389-90, 394-95).

On February 19, 2015, ALJ Scott R. Canfield, held a hearing on plaintiff's 2011 and 2013 applications for CIB and SSI.  (Tr. 39-88)  Plaintiff appeared at the hearing and testified.  A vocational expert, Ms. Zinsmeister, also testified.  (Tr. 80-86)  ALJ Canfield issued a decision on April 27, 2015 denying plaintiff's applications.  (Tr. 10-38)  Plaintiff appealed the ALJ's decision

to the Appeals Council, who denied plaintiff's request for review, thereby making the ALJ's

April 27, 2015 decision the final decision of the Commissioner.  (Tr. 1-5)

## III.     Evidence

### A.     Personal, Educational and Vocational Evidence

Ms. Givhan was born on August 27, 1989. (Tr. 470)  She did not complete high school

and reported that she had attended special education classes while in school.  (Tr. 49)  Ms.

Givhan also reported that she had never worked.  (Tr. 516-520)  However, plaintiff's medical

records show that she has obtained her GED and has attended some classes at a community

college.  (Tr. 965)

### B.     Medical Evidence

#### 1.     Medical Records Related to Physical Impairments

Plaintiff claims that her disability began on January 22, 2011, the day after ALJ Kleber's

decision ruling that plaintiff's benefits based on disability as a child had ended.  (Tr. 13)

Plaintiff treated with neurologist Deepak Raheja, M.D. in March 2010 for dizziness,

headaches, seizure precaution, fibromyalgia and a history of seizures.  (Tr. 659-60, 664-65, 684-

686, 688)  In April 2010, an EMG and nerve conduction study of plaintiff's bilateral upper

extremities showed bilateral median neuropathy of moderate severity at the wrists.  (Tr. 666-668)

In October 2010, plaintiff went to the emergency room for a fainting episode related to

anxiety and stress due to the death of her seven-month old baby.  (Tr. 710-726)

In February 2011, plaintiff was in a car accident and went to the emergency room for

treatment.  (Tr. 741)  She had pain and bruising to her left calf and a lumbar strain.  (Tr. 740)

Plaintiff returned to the emergency room in May 2011 with complaints of abdominal pain; she

was treated and released. (Tr. 745-752)

Dr. Raheja's office notes from March 21, 2011 state that plaintiff had continued complaints of aches, pains, headaches, depression and anxiety.  (Tr. 659)  In March 2011, Dr. Raheja prepared a medical source statement for plaintiff.  (Tr. 842-843)

Dr. Raheja treated plaintiff in November and December 2011 for complaints of pain and seizures and prescribed medications for these symptoms. (Tr. 834-835)

In February 2014, plaintiff returned to Dr. Raheja for a neurological follow-up examination.  (Tr. 945)  Plaintiff complained of episodes of alteration of consciousness occurring several times a day and lasting for a few minutes at a time.  (Tr. 945)  She also complained of headaches, anxiety, emotional incontinence and difficulty sleeping.  (Tr. 945)  On examination, Dr. Raheja noted that plaintiff's cranial nerves were normal; her motor examination showed normal tone, power and coordination in all four extremities; her gait and station were normal; Romberg's sign was negative; and plaintiff's sensory and reflex examinations were also normal. (Tr. 945)  Regarding plaintiff's mental status, Dr. Raheja noted that plaintiff was alert and oriented; had normal attention span and concentration; normal mood and affect; normal naming, repetition of phrases and comprehension; normal recent and remote memory; and normal fund of knowledge of current and past events, vocabulary and cognition.  (Tr. 945)  He diagnosed tension headache; other convulsions anxiety state, unspecified; pseudobulbar affect; and carpal tunnel syndrome. (Tr. 945)  Dr. Raheja prescribed Ibuprofen and Vimpat (an anticonvulsant).  (Tr. 945) He also ordered tests, talked to plaintiff about sleep hygiene, and recommended keeping a headache diary. (Tr. 945)

In April 2014, plaintiff was treated at the emergency room for an alleged assault by her sister, who hit her on the side of the head with a blunt object during an argument. (Tr. 929-937)

Plaintiff had an abrasion on her head.  (Tr. 935)  The remainder of her examination was normal. (Tr. 936)

In December 2014, plaintiff returned to Dr. Raheja for another neurological follow-up visit.  (Tr. 962)  Dr. Raheja's notes indicate that plaintiff's mood and affect were good; she was negative for anxiety; her cognitive function was preserved; her speech was fluent with preserved comprehension and language functions; and he noted no new motor sensory deficits. (Tr. 962)

### 2.    Medical Records Related to Mental Impairments

Plaintiff has had very little mental health care.  The undersigned will provide significant detail from the few available mental health treatment records because: (i) plaintiff claims to have shown she meets the requirements of Listing 12.05, and (ii) the ALJ rejected the supportive findings of the consulting examiners Herschel Pickholtz, Ph.D. and J. Joseph Konieczny, Ph.D. (Tr. 21)

In December 2011, plaintiff self-referred for mental health treatment at Murtis Taylor Human Services (MTHS) for depression related to the death of her baby and her father.  She reported that her depression had started "last year."  (Tr. 821, 827, 830-831)  She provided a history that included the following statements (Tr. 822):

- In regard to Strengths/Capability/Weaknesses: "Strengths – I'm good at doing hair, I'm a strong person. Weaknesses-my son's father is my weakness – he manipulates me."

- In regard to Limitations of Activities of Daily Living (include information relating to financial status and ability to manage own finances): "No income, in process of being evicted, symptoms of depression, seizures."

- In regard to Friendship/Social/Peer Support Relationships: "I don't have any friends – I don't have time to deal w/people, I am miserable [,] I don't do anything anymore."

5

- In regard to Meaningful Activities (community involvement, volunteer activities, leisure/recreation, other interests): "I am in the process of enrolling to attend classes at Tri-C – I am interested in massage therapy – I have to get GED first. I used to do hair – little interest in things at this time."

- In regard to Developmental Issues: "I have trouble comprehending things."

The intake form included a section entitled "Barriers to Learning;" the evaluator checked the box indicating "None Reported." (Tr. 823)  The evaluator also wrote: "Client has not been employed in the past.  Clt. suffers from epilepsy and Hx of anger issues."  (Tr. 823)  The intake form also included a "Problem Checklist Including Functional Domains."  The evaluator recorded the following information obtained from Givhan:

- In regard to Pain Management: "Used to see pain mgmt. doctor at Huron for fibromyalgia prior to Huron closing."

- In regard to Depressed Mood/Sad: "Depressed mood/frequent crying/isolation – feelings of hopelessness and helplessness."

- In regard to Bereavement Issues: "7 month old baby passed away from SIDS last October. Clt. Found father dead three months later."

- In regard to Anxiety: "Worry all the time."

- In regard to Traumatic Stress: "Found baby and father dead."

- In regard to Anger/Aggression: "Hx of anger issues – "I flip out and argue w/people" – I now keep to myself and don't talk a lot."

- In regard to Inattention: "Trouble focusing at times – poor memory since accident as a child."

- In regard to Disturbed Reality Contact (psychosis): "I see my father and my son and talk to them."

- In regard to Mood Swing/Hyperactivity: "Some mood swings."
- In regard to Psychosocial Stress soars: "no income, limited education – fighting SSI case for three years."

- In regard to Pertinent Health Issues/Medical History (include any allergies and food/drug reactions): "Epilepsy, Fibromyalgia, Asthma, Allergic to dairy."

6

- In regard to Client Needs Other Environmental Supports (Describe areas where environmental supports are needed to support the client in community living and possible sources of this support): "Assist w/SSI, Education."

(Tr. 827)  The evaluator described Givhan's affect as "depressed" and indicated she'd had memory issues since childhood car accident. (Tr. 829)

At Murtis Taylor, Plaintiff was diagnosed with Major Depressive Disorder, Single Episode, DSM 296.20; medication and counseling were recommended. (Tr. 830, 832)

In February 2012, plaintiff was examined at MTHS for pharmacological management. (Tr. 836)  Plaintiff was reported to be pleasant, cooperative, and well groomed. (Tr. 836)  She claimed that she heard voices, but had no delusions or paranoia.  (Tr. 836)  In a follow-up examination in July 2012, plaintiff's mood was described as depressed. (Tr. 837)  Plaintiff was prescribed Trazadone, Depakote ER, and Viibryd.  (Tr. 837)  On January 19, 2013, notes from MTHS indicate that plaintiff was stable on her current medications.  (Tr. 838)  On May 11, 2013, plaintiff reported that she had run out of her medications a month ago.  (Tr. 861)  Notes from the May 2013 appointment indicate that she was planning to do GED classes starting in June and was getting ready for a nurse's aide course. (Tr. 861)  Plaintiff's mood was described as depressed "at times."  (Tr. 861)  Plaintiff complained that she was not sleeping well due to bad nightmares without her medications; and she indicated she did not have delusions, paranoia, or auditory or visual hallucinations while taking her medications.  (Tr. 861)  In June 2013, plaintiff's condition was reported as stable on her medications. (Tr. 859)  Plaintiff reported that she was starting GED classes.  (Tr. 859)

In July 2013, Monique Reed, a community support specialist at MTHS, contacted plaintiff to see how she was doing and to set up an appointment.  (Tr. 928)  Plaintiff reported that she was doing okay and recently moved to her own place. (Tr. 928)  At an appointment later that

month, plaintiff reported that she was in classes to get her GED and was looking for a part-time job. (Tr. 927)

In September 2013, plaintiff told Ms. Reed that she liked being on her own and that she was keeping herself active with her son.  (Tr. 925)  Plaintiff reported that she was taking her medications and that they were helping her with anxiety.  (Tr. 925)  In November 2013, counseling notes indicate that plaintiff had moved back in with her mother and that she needed a lot of reminders to keep her appointments. (Tr. 921)  Plaintiff reported that she had anxiety sometimes but would read to help her cope with the anxiety. (Tr. 923)

In January 2014, plaintiff reported that medications were still helping and that she was continuing to keep active and busy with her son. (Tr. 919)  Plaintiff acknowledged that she was having difficulty keeping her appointments with MTHS.  But – signaling that she did have the ability to keep appointments – she told Ms. Reed that she had made sure to attend all appointments and hearings related to her Social Security claim. (Tr. 920)

In February 2014, plaintiff reported pain from fibromyalgia and said that she had to be active – if she sat too long she got stiff and sore.  (Tr. 915)  She reported that she was sleeping and eating well.  (Tr. 915)  She wanted to continue looking for places to live.  (Tr. 915)

In March 2014, plaintiff reported that she was doing okay, but that she needed a lot of reminders. (Tr. 913)  She also stated that she was continuing to keep active and that if she was not doing anything she felt depressed. (Tr. 913)

In May 2014, plaintiff reported that she had been having really bad headaches. (Tr. 907)  She also stated that she was waiting for her Social Security hearing and was hoping to get benefits so that she could get her own place. (Tr. 907-908)  In June 2014, plaintiff reported that she was continuing to have some feelings of anxiety and depression.  (Tr. 904)  She reported that

she was still getting headaches from time to time but that she was doing fair for the most part. (Tr. 904)

In July 2014, Irene Shulga, M.D., a psychiatrist at MTHS, evaluated plaintiff.  (Tr. 964-967)  Plaintiff reported that she was a student at Cuyahoga Community College. (Tr. 965)  Dr. Shulga reported that plaintiff was engaging and that she exhibited good behavioral control and eye contact.  (Tr. 966)  Dr. Shulga judged plaintiff's affect to be "stable [and] appropriate; her mood was noted as depressed. (Tr. 966)  Mild paranoia but no hallucinations were noted.  (Tr. 966)  Dr. Shulga noted her speech to be clear and distinct.  (Tr. 966)  Dr. Shulga also stated that plaintiff's judgment and insight were partial and her intelligence was average.  (Tr. 966)  Dr. Shulga did not note any intellectual disorders or deficits in adaptive functioning. (Tr. 964-967)  Dr. Shulga reported that plaintiff presented with multiple complaints, but that she had no clear cut symptoms of major depressive disorder or bipolar affective disorder.  (Tr. 966)

### C.  Opinion Evidence

#### 1.    Treating Physician – Deepak Raheja, M.D. – March 2011

In March 2011, Dr. Raheja, a neurologist, completed a medical source statement in which he opined that plaintiff was limited to lifting and/or carrying less than five pounds, standing and walking five to ten minutes in an eight hour workday, and sitting 20 minutes in an eight hour workday. (Tr. 842)  He stated that plaintiff could not perform any postural activities.  (Tr. 843)  He further indicated that her ability to reach, handle, feel and push/pull would be affected by her impairment.  (Tr. 843)

The case record presents no other opinions from a treating source.

###### 2.        Examining Physician – Dorothy A. Bradford, M.D.

###### a.        July 2011

Dorothy A. Bradford, M.D., a board certified internist, examined plaintiff on July 22, 2011.  (Tr. 777-784)  Dr. Bradford reported that plaintiff was experiencing total body pains on the day of the exam and would not move her arms or legs, but she observed that plaintiff had been able to ambulate normally to the examination room and was able to arise from her chair, stand and cover her eyes for the eye exam without difficulty.  (Tr. 784)  Dr. Bradford noted that it was difficult to examine plaintiff because she would not voluntarily move or let Dr. Bradford touch certain areas.  (Tr. 780, 782)  Based on plaintiff's reported symptoms, Dr. Bradford noted that it "sounds like" plaintiff had a focal seizure disorder and fibromyalgia. (Tr. 784)  She opined that activity restrictions included "bending, no lifting over 5 pounds, pulling, pushing, squatting."  (Tr. 784)

###### b.        October 2013

On October 21, 2013, Dr. Bradford performed a second consultative physical examination of plaintiff.  (Tr. 892-899)  Plaintiff was lethargic but her gait was normal and she moved easily about the exam room and in and out of chairs.  (Tr. 898)  She had 5/5 muscle testing of her upper and lower extremities. (Tr. 892)  She could grasp, manipulate, pinch, and perform fine coordination in her right and left hands.  (Tr. 892)  She had full range of motion of her cervical and dorsal lumbar spine, as well as full range of motion of her upper and lower extremities.  (Tr. 898)  Plaintiff reported increased sensitivity to light touch. (Tr. 898)  However, Dr. Bradford noted that plaintiff was wearing skin-tight clothing and a tight belt and felt that this contradicted plaintiff's statement that she was sensitive to light touch.  (Tr. 899)  Dr. Bradford

10

opined that, based on plaintiff's complaints, she should avoid being around moving machinery.[1]
(Tr. 11)  Dr. Bradford did not identify any other functional limitations.  (Tr. 899)

### 3.  Examining Psychologist – Herschel Pickholtz, Ed.D. – August 2011

Consultative psychologist, Herschel Pickholtz, Ed.D., evaluated plaintiff on August 16, 2011.  Dr. Pickholtz noted that plaintiff's affect was constricted and her mood was nervous.  (Tr. 797)  Dr. Pickholtz did not administer an IQ test to plaintiff, but believed that her overall level of intellectual functioning was within the extremely low range.  (Tr. 798-799)  Plaintiff told Dr. Pickholtz that she did not do any household chores. (Tr. 799)  She denied any shopping or cooking dinners. (Tr. 799)  She stated that she spent most of her time at home, watching T.V. and taking care of her six-year-old son, including reading to him.  (Tr. 799)  She also admitted that she used the computer approximately one time per week to play solitaire. (Tr. 799)  She denied having any friends, but stated that she socialized with relatives twice a month and went to religious services four times a month.  (Tr. 799)  Dr. Pickholtz diagnosed plaintiff with posttraumatic stress disorder; social phobia; major depressive disorder, recurrent, moderate with mild psychotic features; a learning disorder and plaintiff was assigned a global assessment of functioning ("GAF") score of 41. (Tr. 800)  Dr. Pickholtz opined:

> The impact of mental complaints on the capacities to perform daily activities in an appropriate and timely fashion, interact with others and care for the wants, needs and demands of daily living seems to fall within the serious range. The aforementioned ratings are considered to be accurate estimates of current functioning *without the benefits of mental health medication, monitorship and therapy*. With future psychiatric treatment, I believe the severity and degree of impairment would decrease.

(Tr. 800 emphasis added)

---

[1] Dr. Bradford's October 2013 report actually states that plaintiff "should be around moving machinery." However, this is likely a typographical error.  (Tr. 899)

Concerning Givhan's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks, Dr. Pickholtz opined:

> Her levels of attention and concentration, based upon the mental status evaluation, fell in the severe range. Her pace and persistence approximated the low average range. Her capacities to perform 1 to 3-step tasks, as a result of the severity of her psychiatric conditions, are serious and preclusive of even unskilled labor.

(Tr. 801)  Dr. Pickholtz also described plaintiff's abilities and limitations in responding to work pressures in a work setting:

> Her capacities to handle daily pressures are significantly impaired. Her capacities to handle the pressures of work as a consequence of her serious psychiatric conditions are severely impaired. Under work pressures she would deteriorate and decompensate summarily.

(Tr. 801).

### 5.        Examining Psychologist – J. Joseph Konieczny – July 2013

J. Joseph Konieczny, Ph.D., performed a consultative psychological evaluation of plaintiff on July 26, 2013.  (Tr. 882-886)  When questioned as to her current disability, plaintiff stated "It's depression and the seizures."  (Tr. 883)  Plaintiff reported feelings of depression, crying episodes on a daily basis, and a significantly diminished energy level.  (Tr. 884)  She also reported getting nervous, although she showed no indications of nervousness or anxiety on examination. (Tr. 884)  Dr. Konieczny's report, under the heading "Mental Content," stated:

> No delusional material was elicited during the interview session. There were no indications of any paranoid or grandiose thinking. Upon questioning, Kiara denied having experienced any episodes of auditory or visual hallucinations. Her general thought content, although reflective of her presentation, did not otherwise appear to be unusual.

(Tr. 884)

Dr. Konieczny recorded the following conclusions regarding plaintiff's insight and judgment:

> Kiara's insight into his [sic] current situation seemed fair to poor. She showed moderate deficits in her awareness of rules of social judgment and conformity. She showed mild deficits in her overall level of judgment. Kiara currently resides with her mother and son and participates somewhat in routine daily household responsibilities. She would appear to require supervision and monitoring in the management of her daily activities and in handling her financial affairs. Her overall level of functioning is at a reduced level of efficiency and reflective of her depression and PTSD.

(Tr. 884)

Dr. Konieczny diagnosed chronic post-traumatic stress disorder, major chronic depressive disorder, recurrent and moderate, without full inter-episode recovery, and borderline intellectual functioning. (Tr. 886)  She was assigned a GAF score of 46. (Tr. 886)  Dr. Konieczny opined that plaintiff would have limitations in her ability to understand, remember and carry out instructions. (Tr. 885)  She would have difficulty in her ability to maintain focus and persistence on mild to moderately complex situations in the work setting.  (Tr. 885)  She would have significantly diminished tolerance for frustration and diminished coping skills which would impact her ability to respond to even simple supervision and interpersonal situations in the work setting. (Tr. 885)  She would be easily overwhelmed.  He further opined that she would require supervision and monitoring in the management of her daily activities and in handling her financial affairs.  (Tr. 885)

### 6. State Agency Consultant Opinions

Dr. Walter Holbrook, a state medical consultant, completed a physical residual functional capacity assessment on August 5, 2011.  (Tr. 792)  Dr. Holbrook opined that plaintiff had the residual functional capacity to perform a range of light to sedentary work with limited handling due to carpal tunnel syndrome. (Tr. 111-113, 785-792)   Specifically, Dr. Holbrook opined that

13

plaintiff was capable of lifting and/or carrying a maximum of ten pounds occasionally and five pounds frequently, was able to stand and/or walk for a total of about six hours in an eight-hour workday, was able to sit for a total of about six hours in an eight hour workday, and could frequently use hand and foot controls and push and pull.  (Tr. 786)  He further indicated that plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl; but could never climb ladders ropes, scaffolds and should avoid workplace hazards. (Tr. 787, 789)

On August 30, 2011, Leslie Rudy, Ph.D., a state agency psychological consultant, reviewed the evidence regarding plaintiff's mental status, *including Dr. Pickholtz's opinion*[2], and opined that none of plaintiff's mental impairments were disabling and that she could carry out simple, repetitive tasks in a setting without demands for fast pace, could interact with others on an occasional and superficial basis, and could adjust to occasional changes with some supervisory support. (Tr. 109-110, 114-115)  Nothing in her report indicates that Dr. Rudy considered whether Givhan met the requirements for Listing 12.05. (Tr. 110)

On January 3, 2012, Janet Souder, Psy.D., and Lynne Torello, M.D. reviewed the updated record concerning plaintiff's 2011 applications and agreed with the opinions previously provided by Drs. Holbrook and Rudy. (Tr. 161, 163-165)    As with Dr. Rudy, there is no indication that these reviewers considered whether Givhan's condition met the requirements of Listing 12.05.

---

[2] Regarding Dr. Pickholtz's opinions, Dr. Rudy stated: "Examiner notes significant limitations, but gives some conflicting conclusions." (Tr. 104) She summarized Pickholtz's findings this way:

Aberrant behavior noted. She acted slow, limited and immersed in psychiatric complaints. She rocked back and forth. She had constricted affect and nervous mood. Her pace and persistence were low average. She reports occasional auditory hallucinations. She had poor recall. Her IQ is estimated as borderline. She could not perform serial 7's. Insight and judgment are not adequate to monitor benefits independently. Ox PTSD, social phobia, major depressive disorder, NOS, learning disorder, NOS, GAF 41. (Tr. 108)

(Tr. 160-162)  But Dr. Souder explained why she gave limited weight to Dr. Pickholtz's functional assessment:

> Noted to have depressed mood 1 time at ER visit. No MH treatment since then. No documentation of worsening or new conditions. Portions of psych CE functional assessment (serious limitations in a /c /p /p) are given limited weight as they are not consistent with the details of that interview or clmt's report of daily functioning.

(Tr. 167)

On August 8, 2013, Tonnie Hoyle, Psy.D., a state agency psychological consultant reviewed the evidence, *including Dr. Konieczny's consultative report*, and opined that none of plaintiff's mental impairments were disabling.  (Tr. 225-226)  Dr. Hoyle specifically opined that plaintiff did not meet or medically equal Listing 12.05 for intellectual disability. (Tr. 225)  She believed that plaintiff had the mental capacity to perform work involving simple, routine, repetitive tasks with easily explainable changes that did not involve a production pace or quotas, as previously found by ALJ Kleber. (Tr. 228)

On October 23, 2013, Leon D. Hughes, M.D., a state agency medical consultant, reviewed the evidence regarding plaintiff's physical impairments, including Dr. Bradford's 2013 report, and opined that plaintiff was capable of performing a full range of light work, except that she could never climb ladders, ropes, or scaffolds, and that she could not work around environments where she would be exposed to fumes, odors, dusts, gases, poor ventilation, or hazards, such as machinery and heights. (Tr. 226-227)

On November 14, 2013, Gary Hinzman, a state agency medical consultant, and Carl Tishler, Ph.D., a state agency psychological consultant, reviewed the updated evidence concerning plaintiff's 2013 applications, and affirmed the prior findings made by Drs. Hoyle and Hughes. (Tr. 272-275)

### D.      Testimonial Evidence

#### 1.      Plaintiff's Testimony

Plaintiff testified at an ALJ hearing before Scott R. Canfield on February 19, 2015.  (Tr. 39)  She offered the following testimony pertinent to the issues raised on this appeal:

- Plaintiff lived with her mother and her ten year old son.  (Tr. 46-37)

- They lived in a two-story house and plaintiff testified that it was difficult for her to go up and down stairs, making it necessary to occasionally sleep on the downstairs couch.  (Tr. 48)

- Plaintiff attended special education classes all through school until she quit school in the ninth grade.  (Tr. 49)

- She testified that she had been kicked out of all public schools because she would get frustrated quickly.  (Tr. 50)

- Plaintiff stated that she was a slow reader.  (Tr. 51)

- She also testified that she was bad at math. (Tr. 75)[3]

- Plaintiff had never had a job.  (Tr. 54)  She was unsuccessful volunteering because she got frustrated after being told that she moved too slowly and got into an altercation with a co-worker. (Tr. 55)

- Plaintiff testified that she had seizures while asleep.  (Tr. 56)

- She also stated that she had focal seizures manifested by staring off into space on a daily basis.  Her medications for this condition make her weak and dizzy. (Tr. 56-59)

- Plaintiff complained of pain due to fibromyalgia, but acknowledged that her pain and symptoms were controlled with medication.  (Tr. 48, 64)

- Plaintiff stated that she had numbness and tingling in her fingertips and her knees. (Tr. 72)

- On bad days, plaintiff stayed in bed all day.  She estimated that she had about three bad days per week.  (Tr. 76-77)

---

[3] Plaintiff was asked how much change she would receive if she bought something that cost $7.50 and gave the cashier $10.00.  (Tr. 75)  Plaintiff testified that she knew how much change she would receive back but her answer ($3.00) was incorrect. (Tr. 75-76)

- Plaintiff believed she could walk about a quarter of a block before her legs would start throbbing.  (Tr. 68)  She testified that she could lift a gallon of milk, but would not be able to carry it very far.  (Tr. 68)  She believed she could lift about ten pounds with each hand. (Tr. 69)

- Plaintiff testified that she helped with laundry.  (Tr. 69)  She was able to warm things up, but otherwise was not very good at cooking.  (Tr. 70)  She was able to help with dishes but didn't go grocery shopping. (Tr. 70)  She was unable to tolerate loud noises because they caused bad migraine headaches. (Tr. 70-71)  However, her headaches typically only happened around the time of her menstruation. (Tr. 71)

- Plaintiff reported getting nervous when she was around a lot of people. (Tr. 73)  She was emotional and had bad nightmares at night. (Tr. 74-75)  She had trouble concentrating and trouble remembering. (Tr. 74)  Plaintiff testified that she was unable to watch an entire movie and didn't watch TV at all. (Tr. 74)  Her mother and her sister helped her remember to take her medicine. (Tr. 75)

- Plaintiff testified that she also took medication for depression and that it helped with her symptoms.  (Tr. 78)  She also called a counselor to talk when she was feeling depressed. (Tr. 80)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE"), Ms. Zinsmeister, testified at the hearing.  (Tr. 81-87)

Because plaintiff raises no issue regarding the testimony of the VE, the undersigned will provide only a brief summary of the VE's testimony.  In response to the ALJ's hypothetical questions, the VE testified that someone with plaintiff's limitations could do a range of light work with certain limitations.   The VE testified that three representative occupations fit the description of work that someone like plaintiff could do: merchandise marker, with approximately 11,000 jobs in the state and 300,000 in the national economy; repack worker, with approximately 17,000 jobs in the state and 300,000 in the national economy; and cleaner/polisher, with approximately 20,000 jobs in the state and 400,000 in the national economy.  (Tr. 84-85)

In response to plaintiff's cross examination, the VE admitted that employers would tolerate employee absences "no more than once per month." (Tr. 86)  The VE also opined that employers would tolerate an employee being off task no more that 15% of the time.  (Tr. 86)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[4]....

42 U.S.C. § 423(d)(2)(A).

To determine disability using this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. These are the five steps:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if

---

[4] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v.*

*Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at

Step Five to produce evidence that demonstrates whether the claimant has the RFC and

vocational factors to perform work available in the national economy. *Id.*


## II.     The ALJ's Decision

The ALJ issued a decision on April 27, 2015.  A summary of his findings is as follows:

1. The ALJ presumed that Ms. Givhan met the eligibility requirements for child insurance benefits based on disability February 11, 2011 and June 19, 2013 based on the earnings records of her parents, Diane Givhan and Wade Thompson. (Tr. 16)

2. Ms. Givhan was 21 years old on January 22, 2011, the alleged onset date, and she attained age 22 on August 26, 2011.  (Tr. 16)

3. Ms. Givhan had not engaged in any disqualifying substantial gainful activity since January 22, 2011, the alleged onset date.  (Tr. 17)

4. Ms. Givhan had the following severe impairments: asthma, a focal seizure disorder, fibromyalgia, a depressive disorder, borderline intellectual functioning and posttraumatic stress disorder.  (Tr. 17)

5. Ms. Givhan did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

6. At all times relevant with the exception of briefer periods of less than 12 continuous months, Ms. Givhan retained the residual functional capacity to perform all the basic work activities described in 20 CFR 404.1521, 416.921

19

and 416.945 subject to the following limitations restrictions:  she could lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently; she could stand and/or walk and/or sit for about six hours in an eight-hour workday with normal breaks; she could not climb ladders, ropes or scaffolds; she could not work in environments where she would have concentrated exposure to noise or to fumes, odors, dusts, gases and/or poorly ventilated areas.  The claimant also could not work around hazards such as unprotected heights or uncovered industrial machinery.  She could not operate motor vehicles for commercial purposes.  She was limited to performing simple and repetitive/routine tasks so long as the work did not have to be performed at fast pace, and so long as the work was not subject to strict production quotas, and so long as there would be minimal changes in the work setting, and so long as changes to the work were easy to explain and so long as she did not have to have more than occasional and superficial interactions with members of the public, co-workers and/or supervisors.  (Tr. 21)

7.  Givhan had no past relevant work.  (Tr. 26)

8.  Givhan was considered a younger individual in the 18-49 age group since the alleged onset date of January 22, 2011.  (Tr. 26)

9.  Ms. Givhan had a limited education and was able to communicate in English. (Tr. 26)

10. Transferability of jobs was not an issue because Ms. Givhan did not have any past relevant work.  (Tr. 26)

11. Considering the claimant's age, education, work experience and residual functional capacity, there were jobs existing in significant numbers in the national economy which she could perform.  (Tr. 26)

Based on these findings, the ALJ determined that Givhan had not been under a disability at any time between January 22, 2011, the alleged onset date and the date of the ALJ's decision.  (Tr. 27)

## VI.  Parties' Arguments

Plaintiff makes two contentions: First, the ALJ erred in finding that plaintiff did not meet or equal Listing 12.05(C) or 12.05(D).  Second, the ALJ erred by not assigning controlling

weight to the opinion of plaintiff's treating physician, Dr. Raheja, and by substituting his own judgment for that of a physician.  (Doc. 12)

Defendant argues in response that there was substantial evidence supporting the ALJ's finding that plaintiff's mental impairment did not satisfy the strict requirements of Listing 12.05. Defendant also argues that there was substantial evidence supporting the ALJ's decision to assign less than controlling weight to Dr. Raheja's opinion.  (Doc. 14)

Plaintiff's reply brief argues that defendant improperly relied on evidence not cited by the ALJ concerning the Listing 12.05 issue and raised nothing refuting plaintiff's Listing 12.05 argument.  Plaintiff further argues that defendant's position on the ALJ's weighing of Dr. Raheja's opinion is also based on *post hoc* rationalization and should be rejected. (Doc. 16)

## VII.  Law & Analysis

### A.  Standard of Review

The court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§

405(g) and 1383(c)(3).  The court cannot reverse the Commissioner's findings merely because substantial evidence exists to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986).  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

Beyond considering whether substantial evidence supports the Commissioner's decision, the court must determine whether the ALJ applied the correct legal standards.  Reversal is required when the Commissioner uses incorrect legal standards.  *See e.g. Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006)

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.")

**B.**      **Whether the ALJ Erred in Determining that Plaintiff's Diagnosed Mental Health Conditions Did Not Meet or Medically Equal the Criteria for Listings 12.05(C) or 12.05(D)**

Plaintiff argues that the ALJ erred in finding that her mental impairments did not meet or medically equal the criteria for Listings 12.05(C) or 12.05(D).  To qualify as "disabled" under a Listing in the Secretary's regulations, a claimant must demonstrate that she meets all of the criteria contained in the Listing.  *See Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847,

22

855 (6ᵗʰ Cir. 1986)  Alternatively, "[a] claimant can demonstrate that she is disabled because her impairments are equivalent to a listed impairment by presenting 'medical findings equal in severity to all the criteria for the one most similar listed impairment." *Foster v. Halter,* 179 F.3d 348, 355 (6ᵗʰ Cir. 2001).  "This decision must be based solely on medical evidence supported by acceptable clinical and diagnostic techniques." *Land v. Secretary of Health and Human Services,* 814 F.2d 241, 245 (6ᵗʰ Cir. 1986).  Plaintiff had the burden at step three to prove that she satisfied all of the requirements of the Listing. *Foster v. Halter,* 279 F.3d 348 (6ᵗʰ Cir. 2001).

The pertinent parts of Listing 12.05 provide:

**12.05 *Intellectual disability*:** Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

Thus, plaintiff was required to demonstrate the following three factors to satisfy the intellectual disability criteria in listing 12.05:  (1) subaverage intellectual functioning; (2) onset before the age of twenty-two; and (3) adaptive-skills limitations.  She was also required to show that she

23

had met the requirements stated in one of the subparagraphs of Listing 12.05.  Here, plaintiff

argues that she met the requirements for paragraph C and/or D.[5]

In considering whether plaintiff met listing 12.05, ALJ Canfield began by finding that

plaintiff did not have an impairment or combination of impairments that met or medically

equaled any of the listed impairments.  Next, the ALJ observed that his conclusion was

consistent with the ALJ's decision in Givhan's earlier claim:

> The above finding is consistent with the like "step 3" finding made in the prior
> administrative law judge [sic] that was issued on January 21, 2011.  In reaching
> the same conclusion, the undersigned initially notes that there have been no
> changes in the law since January 21, 2011 that would cause a change in the "step
> 3" finding that was made in the prior administrative law judge decision.

(Tr. 20-21)

In the prior decision, ALJ Kleber also found that plaintiff did not meet or equal Listing

12.05 because, "the claimant . . . shows no significant functional deficits[;] (Ex 1F) therefore her

mental impairments do not meet or medically equal the criteria of listing 12.05."  (Tr. 96)  This

court affirmed ALJ Kleber's decision, adopting the magistrate judge's finding that a 2007

opinion of Dr. Felker provided substantial evidence to support ALJ Kleber's conclusion that

plaintiff did not have deficits in adaptive functioning.  *See Givhan v. Comm'r*, No. 1:13-cv-611,

2015 U.S. Dist. LEXIS 68331 at *17-18 (N.D. Ohio April 29, 2015).  The magistrate judge

found the evidence in the prior case to be:

> Plaintiff had reported to Dr. Felker that she regularly woke-up, got herself
> showered and dressed, and then spent the day caring for her son.  * * * She
> indicated she was able to do dishes, laundry, and use a computer.  * * * She did
> not tell Dr. Felker she required her mother's assistance to do any of these
> activities.  * * * Dr. Felker indicated that Plaintiff had fair attention and

---

[5] ECF Doc. No. 12, Page ID# 1069.

concentration and fair judgment and insight, and had "fairly well developed expressive skills."

The court also found that Dr. Felker's assessment contradicted Givhan's testimony about not being able to do things without assistance and provided further evidence that she did not have any significant deficits in her adaptive functioning. *Id.* at *18.  After the court adopted the magistrate judge's recommendations, Givhan did not appeal. *See Givhan v. Comm'r of SSA,* 2015 U.S. Dist. LEXIS 68330 (N.D. Ohio May 27, 2015).

The existence and outcome of Givhan's prior case is significant.  Both the plaintiff and the Commissioner are bound by the ALJ's findings and the court's judgment from the prior case unless new evidence pertaining to plaintiff's condition has been developed. *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842-843 (6th Cir. 1997).   In addition, Social Security Ruling 98-4(6), 1998 SSR LEXIS 5, mandates:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

SSR 98-4(6), 1998 SSR LEXIS 5, 1998 WL 283902, at *3.  Moreover, it is the plaintiff's burden to show that circumstances have changed following the prior ALJ's decision "by presenting new and material evidence of deterioration." *Drogowski v. Comm'r of Soc. Sec.,* 2011 U.S. Dist. LEXIS 115925, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011) report and recommendation adopted, 2011 U.S. Dist. LEXIS 110609, 2011 WL 4502955 (E.D. Mich. Sept. 28, 2011).  Such evidence is new only if it was "not in existence or available to the claimant at the time of the [prior] administrative proceeding." *Sullivan v. Finkelstein,* 496 U.S. 617, 626, 110 S. Ct. 2658, 110 L. Ed. 2d 563 (1990).  Such evidence is "material" only if there is "a reasonable probability

that the Secretary would have reached a different disposition of the disability claim if presented

with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.,* 865 F.2d 709, 711 (6th Cir.

1988).

Plaintiff's earlier case involved a redetermination of her child disability status after she

turned age eighteen on February 1, 2008.  On January 21, 2011 ALJ Kleber determined Givhan's

"disability ended on February 1, 2008, and she has not become disabled again since that date."

(Tr. 92)  Plaintiff's current claims for child's insurance benefits and SSI, filed on April 8, 2011

assert that Givhan's disability commenced on January 22, 2011, the day after ALJ Kleber's

decision, when plaintiff was still age 21.[6]  (Tr. 13)  Normally, it might be argued that there is no

*res judicata* issue under such a circumstance, given the different periods of disability alleged in

the two cases.  But here, the issues do overlap.  In addition to any ongoing physical impairments,

both cases have required an analysis of whether plaintiff's evidence demonstrated that she had

subaverage general intellectual functioning and deficits in adaptive functioning initially

manifesting before she turned 22 on August 27, 2011.  Thus, the court concurs with the ALJ's

conclusion (Tr. 14) that the issue for determination in this case is whether plaintiff has presented

new evidence that did not exist at the time of her earlier case to support her claims for relief.

Plaintiff argues that the IQ scores and Vineland Adaptive Behavior Scales reported in

consultative exams conducted in 1998 and 2003 support a finding that she was intellectually

disabled under Listing 12.05.  However, these records are not new because they were available to

ALJ Kleber when she issued her prior decision.  Plaintiff also bases her argument on some of the

---

[6] Because of an unexplained failure of the Ohio Division of Disability Determination to process plaintiff's
request for a hearing following the denial of her 2011 claims, plaintiff filed a second application for
child's insurance benefits and a second application for SSI on June 19, 2013. That explains why there are
two separate reviews of plaintiff's claims by the Ohio Division of Disability Determination.

findings in the 2007 consulting psychological examination by Sally Felker, Ph.D. (though she did not mention that Felker opined that plaintiff's 2007 IQ scores probably didn't reflect Givhan's true intellectual capabilities).  Plaintiff criticizes the ALJ's Listing 12.05 analysis because it did not even mention Givhan's low 60s-level IQ scores from the 1988 and 2003 consulting examinations.  She asserts that this evidence shows her subaverage general intellectual functioning with onset before age 22, as required by Listing 12.05.

Defendant argues that substantial record evidence of plaintiff's daily activities supported ALJ Kleber's 2011 determination that plaintiff had no evidence of adaptive functioning deficits. The Commissioner also argues that ALJ Canfield was not permitted to revisit that issue.  The Commissioner further argues ALJ Canfield was barred from relying on the 1998, 2003 and 2007 IQ scores when making his analysis of Listing 12.05 by the requirements of 20 C.F.R. Pt. 404 Supbt. P, App. 1 § 112.00(D)(10) (IQ scores may only be considered for two years when the IQ is determined to be 40 or above).

Although the 1998, 2003 and 2007 IQ scores were not "new evidence," ALJ Canfield could have considered them in conducting his analysis of Listing 12.05, *see Dragon v. Comm'r of Soc. Sec.*, 470 Fed.App'x. 454, 461 (6th Cir. 2012), because the task before him involved a determination of whether the evidence showed that plaintiff had significantly subaverage general intellectual functioning before age 22.  And although ALJ Canfield was bound by the findings of ALJ Kleber on this issue, there was little probative effect from the prior decision.  ALJ Kleber's conclusion that Givhan's mental impairments did meet or equal the criteria of Listing 12.05 made no mention of her historical IQ testing.[7]  Instead, she concluded that the Listing was not

---

[7] ALJ Kleber only referred to the 2007 IQ and adaptive function results in connection with her RFC analysis.  She never mentioned the 1998 and 2003 data at all.

met because there was no evidence of adaptive function deficits.  (Tr. 96)  To state it differently, ALJ Kleber did not fully discuss the significance of Givhan's historical IQ testing.

Plaintiff argues that reports from consultative examiners, Dr. Pickholtz and Dr. Konieczny, conducted in August 2011 and July 2013 also support a finding that she met or medically equaled Listing 12.05.  Regarding these reports, ALJ Canfield stated, "to the extent it is argued that these source's [sic] opinions supports [sic] a finding that the claimant had a listing-level mental impairment(s) at any time relevant to this decision, such opinions are rejected as not being supported by the longitudinal record including the evidence discussed above in the Finding 4 discussion."  (Tr. 21)

The reports from Dr. Pickholtz and Dr. Konieczny embody the only significant new and material evidence supporting plaintiff's claim that she meets Listing 12.05(C) or (D).  But Dr. Pickholtz (Tr. 794-802) and Dr. Konieczny (Tr. 882-886) did not explicitly diagnose plaintiff with an intellectual disability.  Dr. Pickholtz diagnosed a learning disorder (Tr. 800) and Dr. Konieczny diagnosed borderline intellectual functioning. (Tr. 886)  Each of the examiners met with plaintiff once and based his opinion primarily on the information that plaintiff shared during these one-time meetings.

Arguably, these new reports from Dr. Pickholtz and Dr. Konieczny contain facts and medical opinions that would support a finding of deficits in adaptive functioning.  Both of the consulting examiners assigned low ranges of global assessment of functioning for plaintiff. (Tr. 801, 886)  They both voiced concerns that plaintiff would have great difficulties in areas of work performance.  (Tr. 801, 885)  But the new reports also contain information that weighs against a finding of disability.  Dr. Konieczny summarized his opinions by stating that plaintiff's presentation and history "would suggest mild to moderate intellectual limitations." (Tr. 885)  Dr.

28

Pickholtz qualified his opinions by stating that "the aforementioned ratings are considered to be accurate estimates of current functioning "without the benefits of mental health medication, monitorship and therapy."  With future psychiatric treatment, I believe the severity and degree of impairment would decrease." (Tr. 800) He recommended that plaintiff be reassessed after a period of psychiatric medication regimentation. (Tr. 801).  The fact that plaintiff was not taking medication when she met with Dr. Pickholtz is significant.  The agency physicians who reviewed plaintiff's entire record were in a better position to consider whether plaintiff's condition improved with medication (which she was not taking at the time she saw Dr. Pickholtz.)  *See Tate v. Comm'r of Soc. Sec.,* 2014 U.S. Dist. LEXIS 127409, *14 (E.D. Mich. July 31, 2014).

ALJ Canfield did not completely fail to consider the reports of Dr. Pickholtz and Dr. Konieczny.  He considered them and rejected them because he concluded they were inconsistent with the record as a whole. (Tr. 21)  An opinion that is inconsistent with or unsupported by the longitudinal record is entitled to little or no weight. 20 C.F.R. §§ 404.1527(c)(3), (4) 416.927(c)(3), (4).  Earlier in his decision,[8] the ALJ had noted that the record showed that plaintiff was capable of performing housework, taking care of her personal needs, assisting with the raising of her minor child, preparing meals, shopping in stores, and socializing with others. (Tr. 18)  The record also showed that the claimant had been described on numerous occasions since the January 22, 2011 alleged onset date as being alert and/or properly oriented and/or as having good concentration. (Tr. 20)  The record did not show that plaintiff had ever received any emergency treatment for a mental impairment or that she had been psychiatrically hospitalized.

---

[8] In her reply brief, plaintiff argues that defendant made *post hoc* rationalizations for the ALJ's decision at Step 3. (Doc. 16, Page I.D. #1162)  However, ALJ Canfield sufficiently explained his decision at Step 3 by referring to ALJ Kleber's decision and by referring back to findings he had already made in his own decision.

(Tr. 20)  Nor did the record show that there had been a deterioration of plaintiff's adaptive functioning following ALJ Kleber's decision.  Thus, substantial evidence supported ALJ Canfield's decision to reject the new evidence (the reports of Dr. Pickholtz and Dr. Konieczny).

Plaintiff argues that ALJ Canfield erred in failing to consider plaintiff's IQ scores and her subaverage intellectual functioning prior to age 22.  The undersigned agrees that ALJ Canfield – to make his decision more understandable to Givhan and the court – could have included such analysis in his decision.  However, because ALJ Canfield was bound by ALJ's Kleber's decision pursuant to *Drummond*, the focus of his analysis and decision had to be whether new evidence showed that plaintiff had deficits in adaptive functioning.  That was the reason ALJ Kleber determined that plaintiff had not met listing 12.05 and, absent new evidence relating to that specific issue and/or showing deterioration in adaptive functioning, ALJ Canfield was bound by the prior ALJ's decision and her treatment of the IQ scores.  The IQ scores became largely irrelevant because ALJ Kleber had made her decision based on the absence of adaptive function impairments.  Thus, ALJ Canfield's failure to provide more detailed analysis of the IQ scores was not erroneous.  Once he determined there was no new evidence of adaptive function deficits, there was no possible way for plaintiff's Listing 12.05 claim to succeed, regardless of whether he accepted her IQ scores as proof of her general subaverage intellectual function.

"The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily living skills."  *Hayes v. Commissioner,* 357 F.App'x 672, 677 (6th Cir. 2009).  Although Listing 12.05 does not define "adaptive functioning," another portion of the Listings defines "adaptive activities" as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office."  20 CFR Pt.

30

404, Subpt., P, App., 1 § 12.00(C)(1).  Thus, ALJ Canfield's evaluation of adaptive functioning required him to search the record for significant deficits in areas such as self-care, communication, cleaning, shopping, cooking and being able to function independently in terms of daily living.

Substantial evidence supports ALJ Canfield's conclusion that the reports of Drs. Pickholtz and Konieczny were inconsistent Givhan's longitudinal record.  Within the longitudinal record, Givhan had shown, among other things, that she could care for her child; assist in the maintenance of her household; could, at times, live on her own; attend appointments related to her Social Security case; obtain a GED and enroll in college classes.  She had expressed a desire to pursue a career in massotherapy.  One of her biggest stressors was "fighting" her Social Security case and finding a source of income.  Further, Dr. Pickholtz's findings directly suggested that a course of medication and psychiatric therapy could ameliorate the adaptive function issues he had addressed.

Plaintiff Givhan is undoubtedly a person who faces great challenges, some due to her limitations, and some due to the tragic events in her life.  The court does not mean to minimize any of those challenges.  But she has not adduced evidence sufficient to show that she meets or medically equals Listing 12.05.

The ALJ's finding that plaintiff did not meet or medically equal Listing 12.05 should be affirmed.

## C.    Treating Physician Rule

Plaintiff also argues that the ALJ did not articulate good reasons for failing to assign controlling weight to the opinion of her treating neurologist, Dr. Raheja. The administrative regulations implementing the Social Security Act impose standards on the weighing of medical

source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). In making determinations of disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013). The so-called treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6). The ALJ is not required to explain in detail how she considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted). The ALJ is not obligated to provide an "exhaustive factor-by-factor analysis." See *Francis v. Comm'r of Soc. Sec.* 414 Fed. Appx. 802, 804 (6th Cir. 2011).

In the prior disability determination, on January 21, 2011, ALJ Kleber found that plaintiff had the residual functional capacity to perform light work and that she was not disabled.[9]  At the time of that that decision, plaintiff had already been treating with Dr. Raheja; and he had provided a statement indicating that plaintiff was totally and permanently disabled.[10]

In the present disability case, plaintiff claims an onset date of January 22, 2011, the day after ALJ Kleber issued her decision.  (Tr. 488)  Plaintiff had treated with Dr. Raheja before ALJ Kleber issued her decision, but it does not appear that she returned to see him until March 2011, when he completed a physical residual functional capacity form related to plaintiff's physical limitations. (Tr. 666-68, 659)

The decision issued by ALJ Canfield discusses the weight assigned to several different medical opinions.  Regarding the opinion of Dr. Raheja, ALJ Canfield stated:

> * * *  In assessing the claimant's physical residual functional capacity, the undersigned has also considered, but given little weight to, the extreme opinions of a treating physician that are found in exhibit B14F as not being supported by the longitudinal record including the evidence that has been referenced in this decision.

(Tr. 25)  At page 12 of his decision, ALJ Canfield had noted that plaintiff had received "scant treatment for her physical impairments" since the alleged January 22, 2011 alleged onset dates.

(Tr. 24)  He further noted:

> Moreover, the claimant has been described on multiple occasions since the January 22, 2011 alleged onset date as being neurologically intact, and/or as having normal strength and sensation, and/or essentially normal strength and sensation, in her lower and upper extremities, and/or as having a normal gait, and as having normal breathing (see Exs. B3F, pps. 6, 7, 13 and 14; B5F, p. 8; B8F, p. 17; B19F, p. 3; B21F, p. 9; B24F, pps. 8 and 14; B25F; B27F, p.1; and B29F, p. 9). There is also no objective evidence of any seizures since January 22, 2011.  The undersigned has also considered the fact that there is no evidence that the claimant was prescribed copious amounts of pain medications at any time relevant

---

[9] See Case # 1:13-cv-00611, ECF Doc. No. 23, Page ID# 131.
[10] See Case # 1:13-cv-00611, ECF Doc. No. 23, Page ID# 129.

33

to this decision, or evidence that the claimant engaged in any aggressive pain management therapies at any time relevant to this decision, or evidence that the has [sic] claimant required any surgery since January 22, 2011, or evidence that the claimant was hospitalized at any time since January 22, 2011, or evidence that the claimant has needed to use any assistant device such as a cane or crutch to assist with ambulation over any continuous 12-month period relevant to this decision.  Also militating against affording full weight to the claimant's implied allegation that he [sic] has had disabling symptoms is the fact that she has not complied with medical examinations and evaluations since January 22, 2011 (see Exs. B5F, pps. 2 to 5, 7 and 9; B7F, p. 5; and B21F, p. 9).

Plaintiff argues that the ALJ impermissibly substituted his own opinion for that of the treating physician.  However, it appears rather that the ALJ based his decision on the opinions from several reviewing medical sources, including the opinions of Dr. Holbrook and Dr. Torello, who had reviewed plaintiff's medical records in late 2013 (long after Dr. Raheja had submitted his opinion,) and on the October 2013 opinion of a consulting physician, Dr. Dorothy Bradford. (Tr. 25)

In relation to Dr. Bradford's opinions, the ALJ recognized that there was a conflict between the opinion that Dr. Bradford provided in July 2011 and the opinion she provided in October 2013.  In the July 2011 opinion, Dr. Bradford found it difficult to examine plaintiff because she would not voluntarily move or permit Dr. Bradford to touch certain areas. (Tr. 780, 782)  However, Dr. Bradford observed that plaintiff ambulated normally to the examination room and that she was able to sit and arise from a chair without difficulty. (Tr. 784)  Therefore, while Dr. Bradford opined that plaintiff could not lift over five pounds and was restricted from bending, pulling, pushing and squatting, her opinion in July 2011 seemed to be based on plaintiff's subjective complaints.  In October 2013, plaintiff still complained of hypersensitivity to touch but she moved voluntarily and permitted Dr. Bradford to touch her to some degree.  At this exam, Dr. Bradford observed that plaintiff had 5/5 muscle testing of her upper and lower extremities. (Tr. 892)  She could grasp, manipulate, pinch, and perform fine coordination with

34

her right and left hands. (Tr. 892)  Her muscle tone was normal. (Tr. 898)  She also had full range of motion of her cervical and dorsal lumbar spine, as well as full range of motion of her upper and lower extremities. (Tr. 898)  After this later examination, at which plaintiff was better able to cooperate, Dr. Bradford opined that plaintiff's only limitation was that she should not be around moving machinery.[11]  (Tr. 899)  ALJ Canfield noted that this later report from Dr. Bradford was more consistent with the record as a whole and he assigned it greater weight than her earlier opinion.  (Tr. 25)  The undersigned finds that the ALJ appropriately resolved the conflict between the earlier and later opinions of Dr. Bradford.

ALJ Canfield did not substitute his own opinion for the medical opinions in the record. He appropriately based his determination of plaintiff's residual functional capacity on several different medical opinions of reviewing and consulting physicians.  He properly assigned little weight to the opinion of Dr. Raheja which was prepared at plaintiff's first office visit with Dr. Raheja after the alleged onset date of her disability.  As stated by ALJ Canfield, Dr. Raheja submitted an extreme opinion which was not supported by the longitudinal record and the scant treatment plaintiff received for her physical impairments since the January 22, 2011 alleged onset date.  (Tr. 24-25)

The undersigned finds that the ALJ's decision to assign less than controlling weight to the opinion of Dr. Raheja was supported by substantial evidence.  Moreover, the ALJ cited evidence in the record reflecting the findings from medical records and the examinations of other medical professionals.  Because the ALJ adequately handled the opinions of the sole treating source, the undersigned finds that plaintiff's argument on this point lacks merit.

---

[11] As previously noted, this report from Dr. Bradford appears to contain a typographical error in that Dr. Bradford's opinion actually states that plaintiff should be around moving machinery.  (Tr. 899)

## VIII.   Recommendations

The court should find that the ALJ properly determined that plaintiff did not meet or medically equal Listing 12.05(C) or (D) and properly considered and weighed the medical opinion evidence.  The court should further find that the ALJ's decision was supported by substantial evidence and that Ms. Givhan has not demonstrated a basis upon which to reverse or remand the Commissioner's decision.  The final decision of the Commissioner should be AFFIRMED, pursuant to 42 U.S.C. § 405(g).

Dated: April 4, 2017

Thomas M. Parker
United States Magistrate Judge

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).